# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| SHANNON DUX, Special Administrator of the Estate of JOHN DUX, deceased, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 11 CV 7142 |
| v. | ) ) | Judge Joan B. Gottschall |
| UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION & ORDER

In December 2009, doctors at the Edward Hines, Jr. Veterans Administration in Maywood, Illinois, told John Dux that tissue from Dux's prostate tested positive for cancer. On the advice of his doctors, Dux underwent a surgical procedure known as a radical prostatectomy. During the months following the surgery, Dux suffered from incontinence, sexual dysfunction, and depression. In February 2010, the VA doctors told Dux that they were wrong—they had mistakenly switched the tissue from Dux's biopsy with that of another patient, and in fact, Dux's biopsy was negative. Nevertheless, the side-effects of Dux's surgery persisted, his depression worsened, and on September 24, 2010, Dux committed suicide by shooting himself in the head.

Plaintiff Shannon Dux now brings this suit on behalf of her father's estate against the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-80. Count I is a survival action seeking damages for the pain and suffering John Dux experienced while he was alive. Count II is a wrongful death action seeking damages to compensate Shannon Dux for the loss of her father.

Three issues are presently before the court. First, plaintiff moves for partial summary judgment on the issue of whether the government breached the standard of care in misdiagnosing

Dux and advising him to undergo an unnecessary procedure. Second, both parties move for partial summary judgment on the issue of whether the government's breach proximately caused Dux's death. Third, plaintiff moves to exclude the testimony of one of the government's expert witnesses, Dr. Kevin McVary. For the reasons explained below, plaintiff's motion for partial summary judgment on the issue of breach is granted. The government's motion for partial summary judgment on the issue of proximate cause is granted, and plaintiff's motion is denied. Finally, plaintiff's motion to exclude Dr. McVary is denied.

## I. BACKGROUND

John Dux was a military veteran who served in the Vietnam War. It is undisputed that Dux suffered from severe mental health problems throughout his life. Plaintiff's expert, a psychiatrist named Dr. Eric Caine, described Dux as "a guy who was damaged early," having been sexually abused as a child and having suffered from post-traumatic stress disorder after serving in Vietnam. (Caine Dep. 43:23-25, ECF No. 35-8.) Dr. Caine noted that Dux suffered from "major depressive episodes, . . . intermittent heavy alcohol use, hypertension, hyperlipidemia, diabetes, and coronary artery disease." (Caine Report at 1, ECF No. 35-13.) At the VA, Dux had reported "recurring suicidal ideas and plans, insomnia, angry episodes, and recurring troubles with interpersonal relationships . . . ." (*Id.*)

Before 2010, Dux had considered suicide a number of times. When Dux was in his thirties, Dux's wife interrupted him while he was "trying to connect a hose to a car." (Caine Dep. 54:4-7.) In his forties, Dux considered shooting himself with a firearm. (*Id.* at 54:8-12.) He considered suicide again in 2007 after a breakup with his then girlfriend. As Dr. Caine put it, "We certainly know that he had repeated suicidal thinking." (*Id*. at 54:21-22.)

Although Dr. Caine testified that "it's very evident that suicidal thinking [was] part of his psychological repertoire" and that Dux "maintained suicide as an option for his end," Dr. Caine also testified that from 2006 to 2009, Dux "never really moved into the point of threat." (*Id.* at 55:11.) Before his cancer diagnosis in December 2009, Dux was, according to Dr. Caine, "stably unstable." (Caine Report at 3.) He "maintained pleasurable activities and valued relationships, and a sense of himself as a valued service volunteer, which together provided protective and sustaining factors—that is, reasons for living." (*Id.*) Dr. Caine described Dux as a man who, based on the descriptions of his girlfriend, "could be smiling, always having, as she called it, a big grin, who she called cuddly, who was a VA volunteer and was active in the VFW, and could really be pretty socially interactive." (Caine Dep. 41:13-19.)

On July 14, 2009, Dux presented at the VA with elevated "prostate-specific antigen levels (PSA)," a sign that he may have had prostate cancer. Due to the elevated PSA levels, Dux underwent a biopsy performed by doctors at the VA in December 2009. At some point, VA doctors mistakenly switched the tissue from Dux's biopsy with the tissue from another patient's biopsy. Based on the switched result, the VA advised Dux that he had prostate cancer.

On the advice of his doctors, on February 9, 2010, Dux underwent a surgical procedure known as a radical prostatectomy, which involves removing a part of the prostate. Incontinence is a common side effect of a radical prostatectomy, and Dux experienced incontinence following his surgery. For several months, Dux was required to wear diapers, which, in Dr. Caine's opinion, was debilitating and caused Dux to become a "hermit rather than the upbeat man who often was present at the VFW." (Caine Report at 3.) Dux would occasionally try to stop wearing diapers but had accidents when he did so, leaving him vulnerable to embarrassment. (Caine Dep. 61:4-6.)

3

Dux also suffered from sexual dysfunction following the surgery and was "no longer able to engage in a sexual relationship with his girlfriend." (Caine Dep. 121:6-9.) Dr. Caine summarized Dux's situation as follows: "Incontinent and no longer able to engage a sexual relationship with his girlfriend, Mr. Dux perceived that he had lost his manhood and saw no likelihood of recovery." (Caine Report at 3.) Dr. Caine believed that the situation was exacerbated by Dux's "loss of trust in his clinicians and in the VA." (*Id.*)

Sometime around mid-August, Dux was at a bar with his friend, Larry Oldfield, and said to Oldfield, "What am I going to do, I can't stand this, I'm wearing diapers, I'm a grown man, I'm 62, what can I do, I can't even perform with my girlfriend . . . ." (Oldfield Dep. 29:18-21, ECF No. 38-7.) He told Oldfield that "the night before he had put a gun in his mouth and didn't have the guts to pull the trigger." (*Id.* at 19:1-3.) Around this same time, doctors at the VA were also growing concerned about Dux and the fact that he kept firearms in his home. (Caine Dep. 65:22-24.)

At approximately 8:30 p.m. on September 24, 2010, Dux called Oldfield and told him that he was "in trouble." A car had cut Dux off earlier that night as he was leaving the VFW. Dux followed the car. When the car stopped at a light, Dux left his car and punched the other driver in the face. Dux told Oldfield that he was worried about being arrested for having assaulted the other driver. Later that night, Dux committed suicide by shooting himself in the head.

## II. LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate when the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Smith v. Hope Sch.*, 560 F.3d 694, 699 (7th Cir. 2009). "[A] factual dispute is 'genuine' only if a

reasonable jury could find for either party." *SMS Demag Aktiengesellschaft v. Material Scis. Corp.*, 565 F.3d 365, 368 (7th Cir. 2009). The court ruling on the motion construes all facts and makes all reasonable inferences in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is warranted when the nonmoving party cannot establish an essential element of its case on which it will bear the burden of proof at trial. *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012).

### III. ANALYSIS OF SUMMARY JUDGMENT MOTIONS

The Federal Tort Claims Act provides a remedy for personal injury caused by the negligent or wrongful act or omission of government employees while acting within the scope of their employment. *See* 28 U.S.C. §§ 1346(b), 2674. The Act incorporates the law of the place where the act or omission occurred, which in this case is Illinois. 28 U.S.C. § 1346(b).

Under Illinois law, "[t]o recover damages based upon a defendant's alleged negligence, a plaintiff must allege and prove that the defendant owed a duty to the plaintiff, that defendant breached that duty, and that the breach was the proximate cause of the plaintiff's injuries." *First Springfield Bank & Trust v. Galman*, 720 N.E.2d 1068, 1071 (Ill. 1999). The elements at issue in the parties' respective motions for summary judgment are breach and proximate cause.

**A. Breach**

Dux moves for summary judgment on the issue of whether the government breached its duty to Dux by misdiagnosing him. Physicians have a duty "to exercise the same degree of knowledge, skill, and care which a reasonably well qualified physician in the same or similar community would use under similar circumstances." *Jinkins v. Lee*, 807 N.E.2d 411, 421 (Ill. 2004). Although the question of breach is normally a question of fact for the jury, *Lee v. Chi. Transit Auth.*, 605 N.E.2d 493, 502 (Ill. 1992), the court may grant summary judgment for the

plaintiff if the breach is obvious from the undisputed facts. *Gipson v. United States*, 631 F.3d 448, 452 (7th Cir. 2011) (recognizing that failure to tell inmate that aspirin is a blood thinner and that he needed to stop taking it at least five days before his surgery was "so obvious [a breach of the standard of care] that [plaintiff] should have been able to move successfully for partial summary judgment, establishing a breach of the standard of care and leaving only issues of causation and damages for further proceedings").

Here, the government does not dispute that it breached the applicable standard of care. (ECF No. 42, at 2 ("[T]he United States has already admitted the breach . . . ."), 6-7 ("The United States has not denied the error and . . . has acknowledged that the error breached the standard of care."), 7 ("The United States stipulates that it was a breach of the standard of care for the VA to switch the biopsy results and give Dux erroneous information about the results of the biopsy.").) The government's expert witness, Dr. Kevin McVary, likewise conceded at his deposition that in his professional opinion, the government breached the standard of care. (McVary Dep. 24:24-25:2, ECF No. 42-2 ("Q: That [switching of the two patients' biopsy samples] is, in your opinion, a deviation of the generally accepted standards of care, true? A: Correct.").

The government argues, however, that the court should deny plaintiff's motion "because it was unnecessary" in light of the government's stipulation. (ECF No. 42, at 2.) The government cites no authority allowing the court to deny summary judgment as "unnecessary" where, as here, the plaintiff has otherwise established that she is entitled to judgment as a matter of law. A finding by the court that plaintiff is entitled to judgment as a matter of law will provide plaintiff with additional certainty that this issue will not be contested at trial. The court therefore grants plaintiff's motion for partial summary judgment on the issue of breach.

**B. Proximate Cause**

Both parties move for partial summary judgment on the issue of whether the government's breach proximately caused Dux's death. In Illinois, "[t]he term 'proximate cause' describes two distinct requirements: cause in fact and legal cause, which is a policy decision that limits how far a defendant's legal responsibility should be extended for conduct that, in fact, caused the harm." *Lee*, 605 N.E.2d at 502. The parties agree that the government's breach was a cause in fact of Dux's death. The issue is whether it was a legal cause.

"Legal cause is essentially a question of foreseeability: a negligent act is a proximate cause of an injury if the injury is of a type which a reasonable man would see as a likely result of his conduct." *Id.* at 503 (internal quotation marks omitted). "A proximate cause is one that produces an injury through a natural and continuous sequence of events unbroken by an effective intervening cause." *Crumpton v. Walgreen Co.*, 871 N.E.2d 905, 910 (Ill. App. Ct. 2007) (internal quotation marks omitted).

The government argues that it is entitled to summary judgment on Count II (the wrongful death action) because "as a matter of law, Dux's suicide was not reasonably foreseeable as a likely consequence of the alleged breach, and Dux's suicide was an intervening cause of his death." (ECF No. 37, at 1-2.)

"Traditionally, Illinois courts have found suicide to be an unforeseeable act that breaks the chain of causation required by proximate cause." *Johnson v. Wal-Mart Stores, Inc.*, 588 F.3d 439, 442 (7th Cir. 2009) (citing *Luss v. Vill. of Forest Park*, 878 N.E.2d 1193 (Ill. App. Ct. 2007)). "'It is well established under Illinois law that a plaintiff may not recover for a decedent's suicide following a tortious act because suicide is an independent event that the tortfeasor cannot

7

be expected to foresee.'" *Johnson*, 588 F.3d at 442 (quoting *Crumpton*, 871 N.E.2d at 910); *see also Cleveland v. Rotman*, 297 F.3d 569, 572 (7th Cir. 2002) (collecting cases).

For example, in *Crumpton*, the plaintiff sued Walgreens for negligently causing the death of plaintiff's daughter by failing to properly fill her prescription for an antipsychotic medication, which led her to commit suicide. 871 N.E.2d at 907. After a jury returned a verdict in favor of the plaintiff, the trial court entered judgment notwithstanding the verdict in favor of Walgreens, finding that plaintiff could not have established the element of proximate cause because of the "general rule that suicide is an independent intervening act that . . . break[s] the chain of causation." *Id.* at 907, 911. On appeal, the plaintiff argued that the trial court erred in applying the general rule and contended that "proximate cause . . . [was] determined based on the foreseeability that [the daughter's psychosis] would return due to Walgreens' negligence and not based on [the daughter's] subsequent suicide." *Id.* at 911-12. The Appellate Court rejected the plaintiff's argument and affirmed the trial court, adhering to the "general rule 'that a plaintiff may not recover for a decedent's suicide following a tortious act because suicide is an independent intervening event that the tortfeasor cannot be expected to foresee.'" *Id.* at 913 (quoting *Chalhoub v. Dixon*, 788 N.E.2d 164, 168 (Ill. App. Ct. 2003)).

Illinois courts appear to recognize two—and only two—exceptions to the general rule articulated and applied by the *Crumpton* court. The first of these two exceptions "deems suicide foreseeable when the defendant's conduct caused an injury, most often to the head, that made the decedent 'so bereft of reason' as to cause him to attempt suicide." *Johnson*, 588 F.3d at 442 (quoting *Crumpton*, 871 N.E.2d at 911). The exception stems from a passage in *Stasiof v. Chicago Hoist & Body Co.*, 200 N.E.2d 88 (Ill. App. Ct. 1964).

8

In *Stasiof*, the plaintiff attempted suicide five years after an automobile accident. *Id.* at 93. Because the plaintiff "had lived a reasonably normal sane existence for five years and was capable of forming a rational intention to independently take his own life," the court held that the trial judge should have excluded evidence of the plaintiff's attempted suicide in the plaintiff's trial against the allegedly negligent driver. *Id.* The court recognized, however, that there was "an apparent exception to the rule" that there can be no recovery for a suicide following a tortious act "where, as the proximate result of an injury upon his head caused by the negligence of another; the person injured becomes insane and bereft of reason, and while in this condition as a result thereof takes his own life." *Id.* at 92. "His act in this case is not a voluntary one, and therefore does not break the causal connection between the suicide and the act which caused the injury." *Id.* The Illinois Supreme Court affirmed *Stasiof* under the name *Little v. Chicago Hoist & Body Co.*, 203 N.E.2d 902, 903 (Ill. 1965), recognizing that it was "the universal rule followed by most jurisdictions . . . that the victim's act of suicide is a new and independent agency breaking the chain of causation from the negligent act and is not reasonably foreseeable." *Little*, 203 N.E.2d at 903.

The second exception to the general rule that a negligent actor cannot be liable for a victim's decision to kill himself was articulated in *Winger v. Franciscan Medical Center*, 701 N.E.2d 813, 814 (Ill. App. Ct. 1998). In *Winger*, the parents of a patient brought a wrongful death action against a hospital and a psychiatrist after the patient committed suicide while in the defendants' care for severe depression. *Id.* at 814. The court held that the defendants could be found liable for negligence even though the plaintiff had not established that the decedent was "bereft of reason" at the time he committed suicide. *Id.* at 818. The court acknowledged the line of cases recognizing the general rule that a plaintiff may not recover for a decedent's suicide

following a tortious act, but held that those cases were distinguishable. *Id.* Specifically, the court held, "This is an action asserting psychiatric malpractice and the failure to properly supervise; it is different from general medical malpractice actions because the negligence is not in the diagnosis or treatment, but rather, it is in the failure to carefully protect a patient from inflicting self-harm." *Id.*; *see also Jutzi-Johnson v. United States*, 263 F.3d 753, 754 (7th Cir. 2001) ("[T]he doctrine of supervening cause is not applicable when the duty of care claimed to have been violated is precisely a duty to protect against ordinarily unforeseeable conduct. . . . And so a hospital that fails to maintain a careful watch over patients known to be suicidal is not excused by the doctrine of supervening cause from liability for a suicide.").[1]

Turning now to this case, the government is correct that if Illinois's general rule that a negligent actor cannot be liable for a victim's decision to kill himself applies in this case, Dux's wrongful death claim will fail as a matter of law. Thus, the claim will survive only if Dux can satisfy one of the two exceptions to the general rule.

With respect to the first exception, however, there is no evidence that Dux was "insane and bereft of reason" after undergoing the radical prostatectomy. To the contrary, plaintiff's expert, Dr. Caine, testified that there was "no evidence of psychosis," that Dux "knew right from wrong after his surgery," and that there was "no evidence" that Dux was incompetent in the days and weeks leading up to his death. (Caine Dep. 74:20-76:14.) Dr. Caine further acknowledged

---

[1] One justice dissented in *Winger*, arguing, "The state of the law in Illinois on this issue is clear: where a defendant is alleged to be liable in tort for the suicide or attempted suicide of a plaintiff or a plaintiff's decedent, the act of suicide is an independent intervening act which breaks the chain of causation and shields the alleged tortfeasor from liability, unless the injured party is insane or bereft of reason and attempts suicide while in the state." *Winger*, 701 N.E.2d at 820-21 (Holdridge, J., dissenting). In *Hooper v. County of Cook*, 851 N.E.2d 663 (Ill. App. Ct. 2006), the court held that *Winger* did not "change[] the proximate cause analysis in medical negligence cases that involve suicide" and that the court's analysis "pertain[ed] [only] to the 'duty' analysis in a negligence claim, not to a 'proximate cause' or 'legal cause' analysis." *Hooper*, 851 N.E.2d at 671.

that in early September 2010, based on the account of Dux's girlfriend, Dux was looking "a little less depressed." (Caine Dep. 94:10.) He was having "good days and bad days." (*Id.* at 95:17-18.) Although Dr. Caine also testified that at the time of his suicide, Dux was "hopeless and saw no future for himself" (*id.* at 75:24-25), this is significantly different than being "insane and bereft of reason" in terms of whether the act of suicide is "voluntary," thereby "breaking the causal connection between the injury and the suicide." *Stasiof*, 200 N.E.2d at 122.

Nor can plaintiff show that the "psychiatric malpractice" exception applies to Dux's case. The *Winger* court expressly distinguished that case from "general medical malpractice actions" such as this one, where the negligence is "in the diagnosis or treatment" as opposed to "in the failure to carefully protect a patient from inflicting self-harm." *Winger*, 701 N.E.2d at 818.

Because Illinois's general rule that a negligent actor cannot be liable for a victim's decision to kill himself bars Dux's wrongful death claim, and because plaintiff cannot establish that Dux's case falls under any exception to the general rule that is recognized by Illinois courts, the government's motion for summary judgment on the issue of proximate cause is granted. Plaintiff's motion for summary judgment is denied.[2]

---

[2] In this court's view, the traditional rule applied by the Illinois Appellate Courts is misguided. As several courts and commentators have recognized, the rule is premised on an antiquated view of suicide as being a wholly voluntary act. *See e.g.*, STUART M. SPEISER & JAMES E. ROOKS, RECOVERY FOR WRONGFUL DEATH § 2.8 (4th ed. 2008) ("The modern view—in the view of the authors, the better view—is that suicide occurs under a variety of circumstances. As understanding of mental processes continues, it may eventually be held that suicide is *never* a voluntary act, and always occurs in situations of mental illness, extreme stress, or chemical action."); *Edwards v. Tardif*, 692 A.2d 1266, 1270 (Conn. 1997) ("[W]e hold that a physician may be liable for a patient's suicide when the physician knew or reasonably should have known of the risk of suicide and the physician's failure to render adequate care and treatment proximately causes the patient's suicide."). Nevertheless, in applying Illinois law, this court must "give great weight to the holdings of the state's intermediate appellate courts and ought to deviate from those holdings only when there are persuasive indications that the highest court of the state would decide the case differently from the decision of the intermediate appellate court." *Cf. Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630, 637 (7th Cir. 2002)

## IV. PLAINTIFF'S *DAUBERT* MOTION

In addition to her two summary judgment motions, plaintiff has also filed a *Daubert* motion seeking to exclude the government's expert, Dr. Kevin McVary. Dr. McVary opined that even if the VA doctors had correctly told Dux that his biopsy was negative, Dux may have undergone a radical prostatectomy anyway and suffered the same side effects of the procedure. (McVary Report ¶ 23, ECF No. 50-2.) He noted Dux's "high [prostate antigen levels (PSA)] and the steep increase he had experienced in his PSA" and concluded that it was "highly likely that Mr. Dux would have been re-biopsied in subsequent years." (*Id.* ¶ 5.) He further noted that Dux's final pathology, taken during his radical prostatectomy, showed "small foci of prostate carcinoma," indicating that Dux did in fact have prostate cancer. (*Id.* ¶ 1.) He concluded his expert report as follows:

> In summary, the fact of Mr. Dux's switched pathology is unfortunate. All the same, the identical outcome very well could have occurred had he been identified with small volume prostate cancer correctly and counseled accordingly, in which case he may still have chosen extirpative surgery, resulting in the same associated side effects.

(*Id.* ¶ 23.)

Plaintiff argues that Dr. McVary's testimony must be excluded because "it is mere speculation regarding what would have transpired had Mr. Dux . . . not had his cancer-free

---

(discussing how federal courts should ascertain substantive state law when sitting in diversity). Here, the three districts of the Illinois Appellate Court that have considered this issue are in uniform agreement that "a plaintiff may not recover for a decedent's suicide following a tortious act because suicide is an independent intervening event that the tortfeasor cannot be expected to foresee." *Luss*, 878 N.E.2d at 1206; *see also Turcios v. DeBruler Co.*, 12 N.E.3d 167, 173 (Ill. App. Ct. 2014) ("[I]t is . . . true that, in the realm of negligence, suicide is generally regarded as an intervening cause.") (citations omitted); *Crumpton*, 871 N.E.2d at 910; *Kleen v. Homak Mfg. Co.*, 749 N.E.2d 26, 30 (Ill. App. Ct. 2001); *Winger*, 701 N.E.2d at 818 ("We do not disagree that [cases holding that suicide is an intervening cause] remain viable today."); *Moss ex rel. Moss v. Meyer*, 454 N.E.2d 48, 50 (Ill. App. Ct. 1983); *Stasiof*, 200 N.E.2d at 92.

biopsy results switched." (ECF No. 34, ¶ 13.) She notes that Dr. McVary "admits that he cannot say when or if Mr. Dux would have developed prostate cancer that would have been detectable on [a] biopsy" and that he "acknowledged obvious alternative explanations whereby Mr. Dux would never receive a diagnosis of prostate cancer." (*Id.* ¶¶ 13, 15.) She requests that the court bar Dr. McVary pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 597 (1993).

Under Rule 702, an expert witness, "qualified . . . by knowledge, skill, experience, training, or education," may testify if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

Under *Daubert*, this court must function as a "gatekeeper" to "ensure the reliability and relevancy of expert testimony." *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 607 (7th Cir. 2006). "To do so, the district court must ascertain whether the expert is qualified, whether his or her methodology is scientifically reliable, and whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011) (quoting Fed. R. Evid. 702).

Here, plaintiff does not challenge Dr. McVary's qualifications, but she takes issue with the reliability of Dr. McVary's conclusions that (1) Dux would have likely undergone subsequent biopsies; (2) the biopsies would have likely shown that Dux had prostate cancer; and (3) VA doctors would have counseled Dux about the option of a radical prostatectomy had a future biopsy tested positive for cancer. The court addresses each of these conclusions in turn.

13

First, Dr. McVary testified that his opinion that Dux would have likely undergone subsequent biopsies was based on "the slope [and] velocity of his PSA." (McVary Dep. 55:15-16; McVary Report, ¶ 14.) He testified that based on his training and experience as a urologist, he knew that it was likely that doctors would have recommended Dux undergo subsequent biopsies. (McVary Dep. 55:20-21.; *see also id.* at 88:17-22 ("So a patient such as him . . . . I would have done a second biopsy relatively soon . . . .") "Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience." *Walker v. Soo Line R. Co.*, 208 F.3d 581, 591 (7th Cir. 2000). Plaintiff notes that Dr. McVary also testified that it would have been within the standard of care not to repeat a prostate biopsy following Dux's first biopsy and that it is possible that Dux would not have had another biopsy for a significant period of time. (McVary Dep. 130:1-7; 129:3-8.) These arguments, however, are appropriate for cross-examination and go to the weight that a jury should give Dr. McVary's testimony, not the admissibility of that testimony. The court finds this conclusion admissible.

Second, Dr. McVary's opinion that subsequent biopsies would have tested positive for cancer was based on the fact that Dux did, in fact, have prostate cancer (which is undisputed) and the fact that Dux had "high grade [prostatic intraductal neoplasia (PIN)]," implying that Dux's prostate "contained large areas at risk for development of overt prostate cancer." (McVary Report ¶¶5-6; McVary Dep. 116:13-21.) Again, Dr. McVary is qualified by his knowledge, skill, experience, training, and education to offer such an opinion. His admission that it was "possible" that Dux's cancer might not have been detectable goes to weight, not admissibility.

Third, Dr. McVary's conclusion that VA doctors would have likely counseled Dux about the option of a radical prostatectomy is also adequately supported in his expert report and deposition testimony. Dr. McVary noted that "because of the attendant complications, men with

low-volume disease [like Mr. Dux] frequently choose a more aggressive course in which either radiation or surgical extirpation is performed." (McVary Report ¶ 4.) He stated that "part of the informed consent process is to explain the treatment options . . . ." (*Id.* ¶ 7.) The court finds that, as a urologist, Dr. McVary is qualified to offer such an opinion.

Plaintiff's motion to exclude the testimony of Dr. McVary is denied.

### V. CONCLUSION

For the foregoing reasons, plaintiff's motion for partial summary judgment on the issue of breach is granted. The government's motion for partial summary judgment on the issue of proximate cause is granted, and plaintiff's motion is denied. Plaintiff may proceed to trial only on Count I (the survival action). Plaintiff's motion to exclude the testimony of Dr. Kevin McVary is denied. A status hearing is set for October 9, 2014.

ENTER:

/s/
JOAN B. GOTTSCHALL
United States District Judge

DATED: September 24, 2014